UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

GREGORY MCGOWAN, ROBERT W.
BRUDERMAN, THE JOHN W. TEMPLE
REVOCABLE TRUST, and THE
MORRISON FAMILY TRUST, on behalf of
themselves and others
similarly situated,

           Plaintiff,

           -vs-

GEOFF STANLEY, DOUGLAS
MEADOW, RUBY HOLLOW LLC, and
JOHN DOES 1 though 10,

           Defendants.

--------------------------------------------------------x

CIVIL ACTION
INDEX NO.

COMPLAINT

JURY TRIAL DEMANDED

The Plaintiffs, Gregory McGowan, Robert W. Bruderman, the John W. Temple Revocable Trust, and the Morrison Family Trust ("Plaintiffs"), on behalf of themselves and others similarly situated, allege as follows:

Introductory Statement

1. In June 2018, the defendants contracted to acquire: (a) for $2,500,000 an 83.5% interest in the stock, and (b) for $2,000,000 secured and unsecured debt in the principal amount of $3,552,475, of Chief Consolidated Mining Company ("Chief"), a publicly owned but non-reporting Arizona corporation engaged in mining in Utah. The total combined purchase price was $4,500.000.

2. The defendants claimed to have successfully completed the acquisition, paying the total combined purchase price of $4,500,000 to the seller, LeadFX Inc., a Canadian corporation ("LeadFX"), In fact, the defendants, through a series of financial manipulations, ultimately paid

only a small fraction of this amount, or perhaps nothing, for their purported interest. Instead, the defendants misappropriated the entire, or nearly the entire, purchase price from Chief itself, to the detriment of the "minority" shareholders, the more than one thousand other shareholders who did pay for their interests. The monies and assets of Chief appropriated by the defendants were not taken from Chief for any valid corporate purpose, but rather for the personal enrichment of the defendants and to pay the defendants own obligations.

3. In accordance with the defendant's scheme, the majority interest in Chief was acquired using Chief's cash and other assets. If accounted for properly, the use of Chief assets and cash to fund defendants' purported purchase should have resulted in a non pro rata redemption of the 83.5% share interest, rightfully converting that interest to Chief treasury stock, with no ownership whatsoever by the defendants and the almost total elimination of all Chief debt.

4. The defendants' misappropriations left Chief without the resources to participate fully in a mining joint venture to which Chief was a party, resulting in substantial dilution of Chief's interest in that venture, to the further detriment of Chief's other shareholders.

5. Recently the defendants caused Chief to be sold to a third party in a cash-out merger that could possibly be valued at a combined amount of more than $60,000,000, resulting in a huge unearned windfall to the defendants or more than $50,000,000 that rightfully belongs in substantial part, if not all, to Chief's other shareholders.

6. The defendants are like squatters who occupied a house, looted the contents, leveraged the house to generate and loot more cash, and then sold the house and kept the proceeds for themselves.

## Parties and Jurisdiction

7. Plaintiff Gregory McGowan is an individual residing in Florida. Plaintiff Robert W. Bruderman is an individual residing in Nevada. Plaintiff The John W. Temple Revocable Trust is a trust headquartered in Florida. Plaintiff The Morrison Family Trust is a trust headquartered in Nevada. The plaintiffs have been shareholders of Chief since 2002. Their claims are typical of Chief's shareholders, who are so numerous – more than one thousand, -- that it would be impractical to join them.

8. A class action is a superior method for adjudicating the controversy described herein. There are common questions of law and fact affecting the class of Chief shareholders.

9. The Plaintiffs will fairly and adequately represent the class.

10. Geoff Stanley ("Stanley") and Douglas Meadow ("Meadow") are individuals residing in New York, New York (collectively, "S&M"). They are the managers of defendant Ruby Hollow LLC ("Ruby Hollow"), a Delaware limited liability company, with a principal place of business in New York.

11. S&M likewise directed the activities of Chief, which also has a principal place of business in New York.

12. John Does 1 through 10 are members of Ruby Hollow who have wrongfully and disproportionately benefited from the transactions described herein; as well as, other third parties that have materially helped defendants perpetrate their illegal actions.

13. Many of the actions complained of occurred in New York.

14. The Court has jurisdiction pursuant to 28 U.S.C.A. §§1331 and 1332.

Statement of Facts

15. Chief was a 100+ year old mining company with substantially all its assets located within the historic Tintic Mining District located in central Utah. Chief's assets, which had lain dormant for decades, included roughly 14,000 contiguous acres, the vast majority of which consisted of both surface and minerals, including over 900 individual patented mining claims.

16. On July 27, 2018, Ruby Hollow agreed with LeadFX, then Chief's majority shareholder, to pay a total of $4,500,000 to LeadFX for 83.5% of the shares of Chief and the discounted purchase of $3,522,475 in debt purportedly owed by Chief to LeadFX. There were two basic agreements, which were:

(a) the Share Sale Agreement ("SSA") pursuant to which Ruby Hollow was to pay $2,500,000 for 83.5% of the Common Shares of Chief (Exhibit A); and

(b) the Debt Assignment Agreement ("DAA") pursuant to which Ruby Hollow was to acquire, for a steep discount, the $3,522,475 of debt of Chief for $2,000,000 (Exhibit B).

17. On or about December 5, 2018, Ruby Hollow closed with LeadFX, paying $1,000,000 to LeadFX and deferring the rest. (See LeadFX Press Release dated, December 5, 2019, Exhibit C). All or substantially all of the $1,000,000 was repaid from Chief funds to the members of Ruby Hollow as soon as such funds became available.

18. At or about this same time, S&M, acting on behalf of Chief, began negotiations with IG Tintic, LLC, a Delaware limited liability ("IGT"), to form a joint venture, to be known as Tintic Consolidated Metals, LLC ("TCM"). It was contemplated that Chief would contribute 14,000 acres of Chief's minerals and roughly 7,000 acres of Chief's surface rights, to TCM, in

exchange for $3,500,000 of cash to Chief from IGT and a 49% interest in the joint venture. The remaining 7,000 acres of surface rights were to be retained by Chief.

19. On or about February 2, 2019, Chief and the predecessor to IGT entered into a certain Term Sheet in which S&M negotiated to receive a $500,000 secured bridge loan for Chief that would later be used to pay Ruby Hollow obligations. This is the first of several examples of S&M using their positions of trust as the managers of Chief, without any independent input, to negotiate the amounts and timing of payments from IGT, or its affiliates, to Chief. The payments were timed by S&M primarily to meet the amounts and timing of Ruby Hollow obligations to LeadFX with Chief funds

20. On or about April 26, 2019, Chief and IGT, entered into a certain "Framework Agreement" that contemplated that the actual "Operating Agreement" for the joint venture, TCM, would be completed within 10 days or May 5, 2019.

21. On or about June 19, 2019, the Operating Agreement for TCM was finally completed between Chief and IGT, with Chief becoming the junior partner of TCM and being granted 49% ownership, and with IGT becoming the managing partner, holding 51% of TCM, with the business strategy to develop and exploit Chief's legacy mineral rights. Chief's interest in the joint venture was, at that time, by far its most valuable asset.

22. S&M arranged for payments from IGT or TCM related to the joint venture to correspond with the timing for payment of amounts owed by Ruby Hollow to LeadFX.

23. From the February 2, 2019, until April 29, 2019, IGT made a series of payments to Chief, totaling $3,500,000, as part of the joint venture obligations. Nearly simultaneously, Ruby Hollow or its alter ego affiliate, 321888, LLC (a Delaware limited liability company), diverted

those payments to LeadFX in satisfaction of the obligations of Ruby Hollow to LeadFX. The monies paid to LeadFX by Ruby Hollow were the same monies supplied by IGT to Chief for the joint venture.

24. As part of the SSA, Ruby Hollow agreed with LeadFX that as a portion of the purchase price for LeadFX's majority interest in Chief, Ruby Hollow would assume and pay $1,500,000 of Chief's legacy accounts payables, defined as "Third Party Creditors" within the SSA . In fact, the defendants caused Chief to pay the nearly twenty-five (25) separate Third Party Creditors listed in Schedule A of the SSA with Chief cash, while Ruby Hollow received the economic benefit in the form of the 100% reduction in the amounts Ruby Hollow owed to LeadFX for the "Second Tranche" of the purchase price.

25. In an email to plaintiff Gregory McGowan, dated October 23, 2019 (the "Stanley 23 Oct 19 Letter") Stanley, writing as the Chairman of Chief, admitted that Chief's legacy "Third Party Creditors" were paid with Chief funds, stating: "We have restructured Chief's balance sheet by negotiating the creation of a mining and exploration JV company (TCM) which brought a significant funding…That has allowed us to repay, renegotiate and otherwise eliminate a large portion of Chief's liabilities." (See Exhibit D, email from Stanley to plaintiff Gregory McGowan, dated October 23, 2019)

26. That the "Third Party Creditors" were to be paid by Ruby Hollow with Ruby Hollow funds as per the SAA was confirmed by Andrew Worland, the President and CEO of LeadFX in an email to the plaintif McGowan,, dated November 14, 2019 (Exhibit E) in which Mr. Worland wrote: "The balance of the sales proceeds of US$1.5M was deferred for 12 months and the adjustments were to account for known liabilities…for instance…property taxes…If the new buyers had to pay such amounts, they would be deducted from the final payment."

27. Among the "Third Party Creditors" to be assumed and paid by Ruby Hollow were amounts listed in the Schedule A to the SSA as "Property Taxes" in the amount of $385,440. Yet, on or about February 15, 2019, the defendants caused Chief to pay the Utah County Treasurer roughly $304,438 for the Utah County portion of the "Property Taxes", via ten (10) separate transactions to Utah County, Utah, the major component of the total "Property Taxes" due and payable by Ruby Hollow.

28. For another example, the defendants caused the use of Chief's assets to pay a Ruby Hollow obligation in regard to the estimated $340,000 increase of Chief's reclamation bond with the Utah Division of Oil, Gas & Mining (DOGM) in April 2019 (See LeadFX Press Release dated, April 29, 2019, Exhibit F).

29. In the "Stanley 23 Oct 19 Letter", Stanley admitted that the increase in Chief's reclamation bond with DOGM was paid for with Chief funds that Chief had borrowed from CEM & Associates, LLC, a Colorado Limited Liability Company ("CEM"), stating: "The DOGM bonding requirement was recently increased…which was the reason for the loan from CEM, which was drawn down in the amount of $500,000…It was used in a large part to fund the additional…bonding requirement." (See Exhibit G, the Deed of Trust between Chief and CEM, dated April 9, 2019, the "CEM DOT"). This is noteworthy in that as collateral for the CEM Note, S&M, acting as the Managers of Chief, pledged the entire remaining assets of Chief, thus putting Chief at risk should Chief fail to repay this CEM Note and lose all these assets to CEM, purely for the benefit of Ruby Hollow.

30. The fact that the payment of this "increase in Chief's reclamation bond with DOGM" was to be paid by Ruby Hollow with Ruby Holoow funds as per the DAA is clarified and further confirmed by LeadFX within the "Worland November 2019 Email" in which Mr. Worland

7

writes: "In September 2018…DOGM wrote to Chief stating that they would be increasing the bonds on one of the two permits…The new buyers agreed to fund the bond increase and LeadFX agreed to deduct it from the sales proceeds. The amount of the bond increase was US$360K…the balance of US$1.64M (being U$2M less the US$360K) was received in April 2019." (See Exhibit E, Worland Email 11-14-19)

31. Within the "Stanley 23 Oct 19 Letter", Stanley, made a number of incomplete, misleading, or just false statements. One of such statements was regarding one of the officers of Chief and the organizer of the loan to Chief from CEM, a Mr. Tim Buchanan. Mr. Stanley writes: CEM was introduced to us by Tim Buchanan…the Company Secretary for Chief…and I do not believe he has any business relationship with CEM apart from knowing the principals quite well". In fact, Mr. Buchanan was the initial Manager and Organizer, as well as the business office of the CEM entity. (See Exhibit H, the Articles of Organization for CEM & Associates, LLC filed with the Colorado Secretary of State's Office)

32. The defendants, as part of a pattern of misappropriation and fraud, also used Chief joint venture funds to pay other debts that Ruby Hollow had contractually assumed. For example, on August 9, 2018, Ruby Hollow entered into an agreement with Branden Black, an individual and resident of Utah, to serve as a consultant to Ruby Hollow in generating a chain of title related to patented mining claims owned by Chief as a critical portion of Ruby Hollow's due diligence prior to closing the contemplated transaction with LeadFX. On February 28, 2019, the defendants caused Chief to wire Branden Black $20,000 as a payment for an obligation due from Ruby Hollow.

33. As a further example, On or about July 9, 2019, the defendants caused a six-figure payment to be made to Tharp & Associates, LLC by wire to settle a lawsuit brought against

Ruby Hollow for failure to pay Tharp & Associates certain amounts owed to for the introduction of the Chief opportunity. This payment was made directly to Tharp & Associates using Chief funds.

34. As a further example, beginning on or about June 20, 2019, the defendants caused Chief to send 5 wires of Chief funds aggregating over $500,000 directly to the members of Ruby Hollow who had lent Ruby Hollow the initial $1,000,000 to pay to LeadFX for the 83.5% interest in Chief (See LeadFX Press Release dated, December 5, 2019, Exhibit C. As a result, the net investment of the defendants in Chief was then reduced to near zero. Nearly every cent paid for the Chief stock and discounted purchase of the Chief Debt from LeadFX had come from Chief's own funds. No funds went to the other shareholders.

35. With respect to the Debt Assignment Agreement, the defendants also caused Chief's monies to be used to pay Ruby Hollow's obligations to LeadFX. As a result, Chief had $2,000,000 less cash, but still owed $3,500,000 – but no longer to LeadFX, but then rather to Ruby Hollow. The defendants were so brazen that the Defendants directed IGT to send IGT's final payment of $1,800,000, owed by IGT to Chief, to be directly by wired from IGT to Ruby Hollow instead. In turn, Ruby Hollow used these misdirected Chief funds to pay Ruby Hollow's purchase monies to secure the $3,500,000 of Chief debt from LeadFX at the discounted purchase price.

36. Further, the defendants caused Chief to negotiate with IGT as to the amount and the timing of Ruby Hollow's last payment to LeadFX, $1,800,000 due on or about April 26, 2019. This matched perfectly with what defendants had separately negotiated the amount and timing of the final payment that Ruby Hollow would owe to LeadFX, roughly $1,640,000 on or about

April 26, 2019, thus demonstrating the systematic and premeditated use of Chief assets and cash to align with Ruby Hollow's need for cash to pay its obligations to LeadFX.

37. Because of defendants' misappropriation of Chief's joint venture funds, Chief was not able to make proportionate contributions to the TCM joint venture. Chief's interest in the joint venture was diluted down to 25%.

38. The defendants' looting of Chief's assets and cash culminated in the defendants' stealing a Chief corporate financial opportunity that was identified, matured, and brought to Chief by IGT but converted by S&M into a Ruby Hollow financial opportunity. The defendants obtained their claimed majority of Chief under false pretenses, by using Chief's cash and other assets, time and time again, as if they were the defendants' own.

39. The defendants' pattern of bad faith manifested itself in their dealings with the TCM joint venture. On July 10, 2020, IGT filed a lawsuit again Chief in which IGT stated in Paragraph 26, "Throughout the existence the Framework Agreement, Operating Agreement and First Amendment, and increasingly in 2020, (Chief) has engaged in a pattern of delay and lack good faith and best efforts to advance the purposes of Tintic, all in the face of significant, quantifiable and verifiable progress and value creation being made using the capital from (IGT)". During this process, IGT was involuntarily forced to provide its own capital to TCM, to keep the business viable and operating. Because Chief was obligated to make matching payment to TCM, defendants' actions, and refusals to act, resulted in the diminution of the value of the joint venture, and even more so the diminution of Chief's percentage interest in the joint venture.

40. As part of defendants' pattern of obtaining valuable goods and services under false pretenses, they engaged Brendan Black to perform critical due diligence research of the chain of title to the over 700 (seven hundred) individual patented mining claims without intending to pay

Mr. Black for his services. Mr. Black is currently seeking over $100,000 in unpaid fees for these services. The defendants not only used the work product produced by Mr. Black to close with LeadFX, in December of 2018, but also the defendants provided this very same critical work product to IGT during IGT's due diligence process, to close in June of 2019, and later used Mr. Black's work product during the due diligence process conducted by Osisko Development Corp, in December of 2021.

41. In January 2022, the defendants entered into an agreement with Osisko, a Canadian company, to sell Chief's ownership in TCM to Osisko for more than $60,000,000 in a combination of cash and stock, plus deferred payments, using the device of a downstream cash-out merger. Instead of simply selling to Osisko Chief's diluted 25% ownership of TCM in a straightforward transaction, Ruby Hollow required Osisko to restructure the entire transaction to the detriment of the other shareholders but hugely to the benefit the defendants. The restructuring included the defendants' carving off of the remainder of Chief's real estate assets and conveying them to a new company known as Emerald Hollow, LLC, to be owned by the defendants. The defendants were given discretion to select owners of Emerald Hollow. The actual closing occurred on or about May 30, 2022.

42. Inasmuch as the defendants' net investment to acquire Ruby Hollow's interests in Chief was nearly zero, their entitlement to the proceeds of the effective sale of Chief ought, as a matter of corporate accounting, be a similar amount, nearly zero. On the other hand, the so-called "minority" shareholders, who did invest funds in Chief far in excess of that invested by the defendants, are entitled to a substantial portion, if not all, of the amounts claimed by the defendants.

43. For the defendants to achieve a return of more than $50,000,000 in exchange for little or no investment whatsoever, they had to engage in a pattern of activity, described below, that amounts to wire, mail, and securities fraud, as well as breach of fiduciary duty, misappropriation, and waste.

FIRST CLAIM FOR RELIEF

Breach of Fiduciary Duty – Corporate Opportunity; Misappropriation

44. The allegations of paragraphs 1 through 43 are repeated and realleged as if set forth in their entirety herein.

45. By appropriating Chief's funds and assets to acquire the majority interest in Chief and notes owed to LeadFX by Chief for the defendants, rather than acquiring and retiring the shares as treasury stock, the defendants wrongfully seized a corporate opportunity for themselves. There was no valid corporate purpose for using Chief's funds and assets for the vast majority of transactions executed by S&M while acting as the management of Chief since December 5, 2018. Many if not most of the actions taken on Chief's behalf involved conflicts of interest. Such actions were not taken by the defendants in good faith.

46. For such time as the defendants acted in a fiduciary capacity as Chief officers and directors, the defendants breached their fiduciary duty to the other Chief shareholders.

47. As a result of defendants' wrongful actions, the plaintiffs, and all persons similarly situated, have been damaged in an amount to be proved at trial, but believed to exceed $50,000,000.

## SECOND CLAIM FOR RELIEF
Breach of Fiduciary Duty – Waste and Misappropriation

48. The allegations of paragraphs 1 through 47 are repeated and realleged as if set forth in their entirety herein.

49. The use by the defendants of Chief's assets for their own personal purposes, that is, to pay their own obligations to LeadFX, instead of using those assets to maintain Chief's proportionate share of the TCM joint venture, amounts to a waste of corporate assets.

50. Moreover, the use of Chief's assets for the benefit of the defendants was not done for a valid corporate purpose, but rather was a series of acts of misappropriation of Chief assets by the defendants.

51. As a result, the Chief other shareholders have been damaged in an amount equal to the dilution, from 30% to 25%, of Chief's interest in the TCM joint venture caused by the defendants' misappropriation of Chief assets so that Chief's funds were not available for investment in TCM. Such amount is believed to exceed $8,000,000.

## THIRD CLAIM FOR RELIEF
Securities Exchange Act – Scheme or Artifice to Defraud; Rule 10b-5

52. The allegations of paragraphs 1 through 51 are repeated and realleged as if set forth in their entirety herein.

53. The acquisition by the defendants of the stock and debt of Chief, a deregistered publicly held company, was done as part of a scheme to defraud. Though purporting to acquire such securities with their own funds, the defendants, after gaining effective control of Chief, used Chief's own funds and resources to accomplish their acquisition.

54. As a result, the other Chief shareholders were defrauded. The resources, rightfully belonging to their corporation, were employed to enrich the defendants.

55. During the time that the defendants were carrying out their scheme, there were no reports to the other shareholders, although such reports were legally required. Chief had ceased to be a reporting company, although it was legally required because of the number of its shareholders to make periodic reports to the Securities and Exchange Commission.

56. The defendants did not provide any formal financial reports, much less accurate financial reports, to the shareholders. Such reports as they did provide were not audited or reviewed, did not accord with generally accepted accounting principles, did not carry over balances from year to year, and did not even add up. Further, S&M, acting as the managers of Chief did respond from time to time to specific emails from Chief's other shareholders, however such verbal and written responses were incomplete, misleading, or just false.

57. One glaring example of such incomplete, misleading and false statements was within the "Stanley 23 Oct 19 Letter" (Exhibit D) In this letter, Stanley wrote: "It is worth noting that since acquiring control of Chief and assuming management roles neither Doug Meadow nor myself have taken any remuneration from Chief, nor…other benefits via payments of any of Chief's liabilities". In fact, between the Closing Date, of December 5, 2018, and the writing of Stanley's letter, October 23, 2019, S&M had caused Chief to pay nearly $1,000,000 in Ruby Hollow obligations to LeadFX using Chief funds, thus providing equal "remunerations and benefits" to the defendants, and nearly $500,000 in direct disbursements from Chief to S&M and other members of Ruby Hollow for repayment of S&M's loans to RH to make their initial payment from Ruby Hollow to LeadFX on December 5, 2018. The defendants also caused Chief to make enormous "consulting" payments. Although Stanley represented that "an accounting

14

firm has been retained to produce up to date accounts," there is no evidence of any such accounting firm or up to date accounts.

58. In connection with the cash-out merger, whereby many shareholders' interests other than those of the defendants were extinguished, the defendants concealed the material facts of their looting and misappropriation.

59. In carrying out their scheme to defraud, the defendants violated the provisions of Rule 10b-5 issued under the Securities Exchange Act of 1934 ((15 U.S.C. 78a et seq.),

60. As a result of defendants' scheme, the plaintiffs, and all persons similarly situated, have been damaged, in an amount to be proved at trial, but believed to exceed $50,000,000.

FOURTH CLAIM FOR RELIEF
Racketeering – 28 U.SC. §1962(b)

61. The allegations of paragraphs 1 through 60 are repeated and realleged as if set forth in their entirety herein.

62. The defendants engaged in a pattern of mail and wire fraud, in violation of 18 U.S.C. §§1341 and 1343, by using the mails and wire facilities of the United States on more than twenty occasions to misappropriate and transfer Chief funds for their own private purposes, and to obtain money or property under false pretenses.

63. These predicate acts were undertaken by the defendants for the purpose of acquiring control of an enterprise engaged in interstate commerce, namely Chief.

64. As a result of defendants' activities in violation of 18 U.S.C. §1962(b), Chief's other shareholders have been damaged, in an amount to be proved at trial, but believed to exceed $50,000,000.

## FIFTH CLAIM FOR RELIEF
Racketeering – 28 §1962(c)

65. The allegations of paragraphs 1 through 64 are repeated and realleged as if set forth in their entirety herein.

66. The defendants conducted the affairs of an enterprise, Chief, through a pattern of racketeering in violation of 18 U.S.C. §1962(c).

67. The defendants engaged in at least twenty acts of wire and mail fraud, obtaining money or property by false pretenses, using the mails and wires in interstate commerce, when the appropriated Chief's property for their own personal purposes.

68. As a result of defendants' activities in violation of 18 U.S.C. §1962(c), the Chief "minority" shareholders have been damaged, in an amount to be proved at trial, but believed to exceed $50,000,000.

Wherefore, plaintiffs pray for relief as follows:

Under the First Claim for Relief (Misappropriation of Corporate Assets and Opportunities), for damages equal to the amount received by defendants from the cash-out merger in excess of their equitable share based upon generally accepted accounting principles, and in addition, by the amount of the dilution of Chief's interest in TMC because defendants misappropriated Chief's financial resources;

Under the Second Claim for Relief (Waste), for damages in an amount equal to the value of the dilution of Chief's interest of TCM caused by defendants' misappropriation of Chief funds for their own purposes;

Under the Third Claim for Relief (Securities Fraud), for damages equal to the amount received by defendants from the cash-out merger in excess of their equitable share based upon generally accepted accounting principles;

Under the Fourth Claim for relief (Acquisition of an Enterprise by a Pattern of Racketeering), for damages equal to the amount received by defendants from the cash-out merger in excess of their equitable share based upon generally accepted accounting principles, to be trebled pursuant to 18 U.S.C. §1964, costs and reasonable attorneys' fees; and

Under the Fifth Claim for relief (Operating an Enterprise through a Pattern of Racketeering), for damages equal to the amount received by defendants from the cash-out merger in excess of their equitable share based upon generally accepted accounting principles, to be trebled pursuant to 18 U.S.C. §1964, costs and reasonable attorneys' fees; and

Together with costs and expenses, and such other relief as the Court deems just or equitable.

Dated: August 15, 2022

                                                SOLOMON BLUM HEYMANN LLP
Attorneys for Plaintiffs

By S/ A. M. Richardson
A. M. Richardson, III (AR-0704)
40 Wall Street, 35th Floor
New York, New York 10005
(212) 267-7600; arichardson@solblum.com